1  DIANE J. HUMETEWA
   United States Attorney
2  District of Arizona

3  REID C. PIXLER
   Assistant U.S. Attorney
   Arizona State Bar No. 12850
4  Two Renaissance Square
   40 North Central Avenue, Suite 1200
   Phoenix, Arizona 85004-4408
5  Telephone (602) 514-7500
   reid.pixler@usdoj.gov

6                    UNITED STATES DISTRICT COURT

7                         DISTRICT OF ARIZONA

8  United States of America,

9          Plaintiff,                          **CV 08-1499 PHX LOA**

10         v.                               MOTION FOR JUDGMENT
                                             ON THE PLEADINGS,
11 $93,110.00 in U.S. Currency,              Fed.R.Civ.P. 12(c)

12         Defendant.

13         Plaintiff, United States of America, by and through its attorney, Diane J. Humetewa,

14 United States Attorney for the District of Arizona, Reid C. Pixler, Assistant United States

15 Attorney, of counsel, files this Motion For Judgment on the Pleadings, pursuant to

16 Fed.R.Civ.P 12(c).  This motion is supported by the attached memorandum of points and

17 authorities and the following pleadings already filed in this action:

18         1.     Verified Complaint For Forfeiture *In Rem*, filed August 14, 2008;

19         2.     Warrant For Arrest *In Rem*, filed by the Court on August 21, 2008;

20         3.     The Answer filed by claimant on August 25, 2008.

21         Respectfully submitted this 19th day of September, 2008.

22

23                                         DIANE J. HUMETEWA
                                            United States Attorney
24                                          District of Arizona

25                                          *S/Reid C. Pixler*

26

27                                          REID C. PIXLER
                                            Assistant U.S. Attorney

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### Relevant Admissions and Denials Contained in Claimant's Answer

1. This is a civil action *in rem* to forfeit and condemn to the use and benefit of the United States of America the following: $93,110.00 in U.S. currency, more or less; (hereinafter defendant).  **Admitted**

2. While the sum of the *res* in this action is $93,110.00 and is subject to forfeiture for specific events, two subsets of the funds are involved in unique and specific events giving rise to forfeiture pursuant to separate statutes.  Despite the allegations regarding the subsets of defendant, the total never exceeds $93,110.00.  **Admitted**

3. This is a civil action *in rem* , seeking to forfeit to the United States $29,880.00 in U.S. currency, a subset of defendant, for violations of 18 U.S.C. § 881(a)(6), seeking the forfeiture of currency which represents proceeds in trafficking in controlled substances or was used or intended to be used in exchange for controlled substances or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. §§ 801, et seq.  **Admitted**

4. This is also a civil action *in rem* , seeking to forfeit to the United States $63,230.00 in U.S. currency, a subset of defendant, as proceeds traceable to a conspiracy to transport and/or harbor certain aliens in violation of 8 U.S.C. §1324(a)(1)(A)(ii) and (iii), which is a "specified unlawful activity as defined in 18 U.S.C. §1956(c)(7)(A) and §1961(1), and a conspiracy to engage in money laundering in violation of 18 U.S.C. §1956(h), concerning a violation of Title(s) 8, United States Code, Section(s) 1324(b) and Title 18 United States Code, Section  981.  **Admitted**

5. In addition, this is a civil action *in rem*, brought to enforce the provision of 31 U.S.C. § 5317(c)(2) for the forfeiture of property involved in a violation of 31 U.S.C.§ 5324(c)(1) and (3) or a conspiracy to commit such a violation, to wit: currency in an amount greater than $10,000 was structured in amounts smaller than $10,000 to avoid the reporting requirements of 31 U.S.C. § 5316(b), which was transported into the United States from or through a place outside the United States and no Cash and Monetary Instrument Report (CMIR) was filed disclosing the information required in 31 U.S.C. § 5316(b).  **Admitted**

1    6.    In addition, this is a civil action *in rem*, brought to enforce the provision of 31
2    U.S.C. § 5332(c) for the forfeiture of property involved in a violation of 31 U.S.C.§ 5332(a)
3    or a conspiracy to commit such a violation, to wit: currency in an amount greater than
4    $10,000 was concealed on the person of an individual or in a conveyance, article of luggage,
5    merchandise, or other container and was transported and transferred from a place within the
6    United States to a place outside the United States with the intent to evade the currency
7    reporting requirement of 31 U.S.C. § 5316. **Admitted**

8    7.    In addition, this is a civil action *in rem*, brought to enforce the provision of 31
9    U.S.C. § 5332(c) for the forfeiture of property involved in a violation of 31 U.S.C.§ 5332(a)
10   or a conspiracy to commit such a violation, to wit: currency in an amount greater than
11   $10,000 was concealed on the person of an individual or in a conveyance, article of luggage,
12   merchandise, or other container and was transported and transferred from a place outside the
13   United States to a place within the United States with the intent to evade the currency
14   reporting requirement of 31 U.S.C. § 5316. **Admitted**

15   8.    In addition, this is a civil action *in rem*, brought to enforce the provision of 31
16   U.S.C. § 5317(c) for the forfeiture of property involved in a violation of 31 U.S.C.§
17   5316(a)(1)(A) or a conspiracy to commit such a violation, to wit: currency in an amount
18   greater than $10,000 at one time was transported from a place in the United States to or
19   through a place outside the United States and no Cash and Monetary Instrument Report
20   (CMIR) was filed disclosing the information required in 31 U.S.C. §5316(b). **Admitted**

21   9.    In addition, this is a civil action *in rem*, brought to enforce the provision of 31
22   U.S.C. § 5317(c) for the forfeiture of property involved in a violation of 31 U.S.C.§
23   5316(a)(1)(B) or a conspiracy to commit such a violation, to wit: currency in an amount
24   greater than $10,000 at one time was transported to a place in the United States from or
25   through a place outside the United States and no Cash and Monetary Instrument Report
26   (CMIR) was filed disclosing the information required in 31 U.S.C. §5316(b). **Admitted**

27   10.   In addition, this is a civil action *in rem*, brought to enforce the provision of 31
28   U.S.C. § 5317(c) for the forfeiture of property involved in a violation of 31 U.S.C.§

5316(a)(2) or a conspiracy to commit such a violation, to wit: currency in an amount greater than $10,000 at one time was received in the United States which was transported into the United States from or through a place outside the United States and no Cash and Monetary Instrument Report (CMIR) was filed disclosing the information required in 31 U.S.C. §5316(b). **Admitted**

11.     Venue and Jurisdiction for the Seizure of Assets in Arizona is based upon 21 U.S.C. § 881(j), 28 U.S.C. § 1355(b) and § 1395 based upon acts and omissions occurring in the District of Arizona giving rise to this forfeiture action.  This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345; 1355; and 18 U.S.C. § 981 (h), because the defendant was found in this district. **Generally admitted, but partially denied on the basis claimant wanted the case transferred to the Tucson division.**

53.  According to Constantino, the money in the approximate amount of $28,000 had been acquired from a number of friends which included Elsa Bernal. **Denied for lack of specific knowledge.**

**Interview of Elsa Bernal**

58.  According to the border crossing records of ICE, on March 11, 2008, at 18:55 hours Elsa Bernal left her home in Agua Prieta, Sonora, Mexico, and entered the United States at the Douglas, Arizona Port of Entry.  **Denied**

59.  Detective Gregory Westover met Elsa Bernal at 620 W.  Washington St., Phoenix, Arizona at approximately 20:00 hours on March 11, 2008, in order to take a statement from her and to receive funds to be used as a portion of the ransom.  **Denied**

60.  Pursuant to procedures of his unit, Detective Westover obtained finger print identification and took the photo of Elsa Bernal.  **Denied**

61.  A computer record generated when the identification process was completed displays the time of 8:26:25 PM, or 20:26 hours on March 11, 2008.  **Denied**

62.  The Port of Entry at Douglas, Arizona, is approximately 232 miles from the Phoenix Police Department or approximately four hours by highway.  **Denied**

1        63.  It is not possible for Elsa Bernal to enter the United States at Douglas, Arizona, at

2  18:55 hours and arrive at the Phoenix Police Department at approximately 20:00 hours.

3  **Denied**

4        64.  Upon information and belief, Elsa Bernal allowed another individual, probably a

5  female, to use her identification to illegally enter the United States while Elsa Bernal

6  remained in the United States in the Phoenix area.  **Denied**

7        65.  Detective Westover received the currency which Elsa Bernal delivered to be used

8  as "drop money" in the effort to pay a ransom for the release of Pedro.  **Denied**

9        78.  Elsa described Pedro Casteneda as her boyfriend and, on occasion, as her

10  husband, despite the fact that they were not married.  **Admitted**

11        79.  Elsa also advised that she and Pedro had a 3 year old daughter together.

12  **Admitted**

13        81.  Elsa advised that she lives in Agua Prieta, Sonora, Mexico and regularly drove to

14  Phoenix to visit Pedro every two weeks.  **Admitted**

15        82.  On March 4, 2008, at about 15:00 hours Pedro called Elsa advising he had been

16  kidnaped and the people holding him were demanding $200,000 for his release.  **Admitted**

17        83.  Pedro asked Elsa to contact his friends in Agua Prieta to raise the money and not

18  to call the police.  **Admitted**

19        85.  After Pedro made his plea, Elsa heard an unknown Hispanic male say that if she

20  called the police he would kill Pedro.  **Admitted**

21        86.  Thereafter, Elsa could hear violent blows hitting Pedro and his resulting screams

22  which continued until she hung up the phone.  **Admitted**

23        90.  Elsa claimed to have sold her Expedition for $15,000 to raise some of the money.

24  **Admitted**

25        91.  On March 5, 2008, Elsa decided to contact an attorney friend in Agua Prieta about

26  a course of action regarding the kidnaping of Pedro.  This friend advised her to contact the

27  Mexican Consulate in Douglas to report the crime in Phoenix.  **Admitted**

28

1    93.   Upon returning to her home Maribel, her 35 year old sister, advised Pedro had
2    called while Elsa was gone.  Pedro said to have Elsa stay at home so he could call her.
3    **Admitted**

4    94.   Maribel then heard a different male voice who said it was not a game and if they
5    did not receive the money they would kill Pedro.  She had two days to get the money.
6    **Admitted**

7    95.   Shortly after this conversation, Fabian spoke with Elsa to advise he had received a
8    call from Pedro, who said they had cut off one of his fingers and would cut another one off
9    each day until they received the money.  **Admitted**

10   96.   Elsa waited for another call, but received no more that day or the next.  **Admitted**

11   97.   On March 7, 2008, Pedro called Elsa and told her not to leave the house.  Pedro
12   said he was bleeding badly from wounds on his head and body.  **Admitted**

13   98.   An unknown voice then advised Elsa that she should not leave her house because
14   they had people watching her.  She was to obtain the money and get the money to an account
15   in Sinaloa, Mexico.  **Admitted**

16   99.   On March 10, 2008, at about 11:00 Elsa said she received a call at her home in
17   Agua Prieta advising that this was the last day to raise the money or they would kill Pedro.
18   However, they would accept $100,000.  **Admitted**

19   100.  After receiving this information she could again hear Pedro screaming in pain as
20   the result of a beating she thought he was receiving.  **Admitted**

21   101.  Elsa claimed she received another call at her home in Agua Prieta at about 15:00
22   hours advising her they wanted the money in Phoenix and they would give her four hours to
23   get the money there.   **Admitted**

24   102.  At 20:00 hours Elsa stated they called her again and wanted to know where the
25   money was.  **Admitted**

26   103.  Elsa told them the money was being driven up in three cars because of the
27   amount of the money.  The caller was not happy and threatened to raise the price.  **Admitted**

28

5

1    104.  This money was gathered together in Agua Prieta to be transported to Phoenix to
2    pay the ransom, but no CMIR report was filed for the entry of this money into the United
3    States.  **Admitted**

4    105.  On March 11, 2008, at approximately 10:00 hours Pedro called again to advise
5    he was OK.  An unknown voice advised Elsa that she had until 15:00 that day to get the
6    money.  **Admitted**

7    157.  Elsa denied taking the ransom money held by the Phoenix Police Department
8    into Mexico and claimed she left $64,000 at her sisters home in Douglas.  **Denied**

9    162.  Elsa claimed that $35,000 of the currency was provided from a loan on her
10   home, however no evidence was submitted regarding this source of funds.  **Denied**

11   164.  Elsa provided seventeen (17) receipts written in Spanish which she claimed to be
12   the source for a substantial sum of the money obtained to be used to pay the ransom of Pedro.
13   **Denied**

14   165.  Elsa alleged that the receipts were withdrawal slips from financial institutions
15   made by family and friends who contributed to the payment of the ransom.  **Denied**

16                                    **THIRD CLAIM**

17          Based on the aforementioned facts and circumstances, the above described
18   defendant, in the approximate amount of $93,110, is property within the jurisdiction of the
19   United States which is subject to forfeiture pursuant to the provisions of 31 U.S.C. §
20   5317(c)(2) as currency involved in a violation of 31 U.S.C.§ 5324(c)(1) and (3) or a
21   conspiracy to commit such a violation, to wit: currency in an amount greater than $10,000
22   was structured in amounts smaller than $10,000 to avoid the reporting requirements of 31
23   U.S.C. § 5316(b), which was transported into the United States from or through a place
24   outside the United States and no Cash and Monetary Instrument Report (CMIR) was filed
25   disclosing the information required in 31 U.S.C. § 5316(b).  **Denied**

26                                    **FOURTH CLAIM**

27          Based on the aforementioned facts and circumstances, the above described
28   defendant, in the approximate amount of $93,110, is property within the jurisdiction of the

1   United States which is subject to forfeiture pursuant to the provisions of 31 U.S.C. § 5332(c)

2   as currency involved in a violation of 31 U.S.C.§ 5332(a) or a conspiracy to commit such a

3   violation, to wit: currency in an amount greater than $10,000 was concealed on the person of

4   an individual or in a conveyance, article of luggage, merchandise, or other container and was

5   transported and transferred from a place within the United States to a place outside the

6   United States with the intent to evade the currency reporting requirement of 31 U.S.C. §

7   5316. **Denied**

## FIFTH CLAIM

9           Based on the aforementioned facts and circumstances, the above described

10  defendant, in the approximate amount of $93,110, is property within the jurisdiction of the

11  United States which is subject to forfeiture pursuant to the provisions of 31 U.S.C. § 5332(c)

12  as currency involved in a violation of 31 U.S.C.§ 5332(a) or a conspiracy to commit such a

13  violation, to wit: currency in an amount greater than $10,000 was concealed on the person of

14  an individual or in a conveyance, article of luggage, merchandise, or other container and was

15  transported and transferred from a place outside the United States to a place within the

16  United States with the intent to evade the currency reporting requirement of 31 U.S.C. §

17  5316. **Denied**

## SIXTH CLAIM

19          Based on the aforementioned facts and circumstances, the above described

20  defendant, in the approximate amount of $93,110, is property within the jurisdiction of the

21  United States which is subject to forfeiture pursuant to the provisions of 31 U.S.C. § 5317(c)

22  as currency involved in a violation of 31 U.S.C.§ 5316(a)(1)(B) or a conspiracy to commit

23  such a violation, to wit: currency in an amount greater than $10,000 at one time was

24  transported to a place in the United States from or through a place outside the United States

25  and no Cash and Monetary Instrument Report (CMIR) was filed disclosing the information

26  required in 31 U.S.C. § 5316(b). **Denied**

## EIGHTH CLAIM

28

7

Based on the aforementioned facts and circumstances, the above described defendant, in the approximate amount of $93,110, is property within the jurisdiction of the United States which is subject to forfeiture pursuant to the provisions of 31 U.S.C. § 5317(c) as currency involved in a violation of 31 U.S.C.§ 5316(a)(2) or a conspiracy to commit such a violation, to wit: currency in an amount greater than $10,000 at one time was received in the United States which was transported into the United States from or through a place outside the United States and no Cash and Monetary Instrument Report (CMIR) was filed disclosing the information required in 31 U.S.C. § 5316(b).  **Denied**

**ARGUMENT**

### A. Factual Analysis

Claimant admitted paragraphs 1through 11of the complaint which allege the *res* involved in this action is $93,110 and the government has alleged multiple theories which, if established to the satisfaction of the Court, would result in the forfeiture of the *res*. Claimant also generally admited paragraphs ¶78 to ¶105. These admissions include claimant considers Pedro Castaneda her boyfriend/husband (¶78); they have a 3 year old daughter together (¶79); claimant lives in Agua Prieta, Sonora, Mexico and regularly drives to Phoenix to visit Pedro (¶ 81).

Claimant also admitted specific allegations regarding the kidnaping of Pedro generally between ¶82 and ¶105. Claimant admitted Pedro called her on March 4, 2008, to advise he had been kidnaped and the ransom was $200,000 (¶82); claimant was to contact friends in Agua Prieta to raise money (¶83); claimant stated she sold her Expedition to raise money but never alleged whether or how this sum was included in the *res* in this action (¶90); she admitted details regarding additional threats and directions from those who kidnaped Pedro including directions requiring claimant to deliver the ransom, reduced to $100,000, to an account in Mexico ( ¶¶91-100). The significance of these admissions is claimant is the primary point of contact receiving communications from Pedro and those who held him hostage. Claimant was made responsible for gathering the funds and reacting to the demands of the kidnapers regarding how the *res* was to be delivered. In short, claimant was an active member of the team gathering cash and organizing the delivery of the ransom and knew what was being done, including the movement or transportation of the cash.

Five admissions critical to the analysis follow: The previous admissions addressed the instructions for claimant to gather and deliver the funds to an account in Mexico. However, on March 10, 2008, at about 15:00 (about 3pm) claimant admitted (¶101) she was at her home in Mexico when she was advised the kidnapers want the money in Phoenix and she had only four hours to get the money there. The Court can take judicial notice of the fact

1   it is more than 200 miles by road from Agua Prieta, Mexico to Phoenix, Arizona.  It would

2   be difficult to accomplish this drive in four hours.

3       Claimant admitted (¶102) the kidnapers called at about 20:00 (about 8pm) wanting to

4   know where the money was.  Claimant admitted she told the kidnapers the money was being

5   driven in three cars from Agua Prieta, Mexico to Phoenix to pay the ransom  (¶¶103-104) .

6   Claimant admitted she knew the money was being transported into the United States from

7   Mexico to pay the ransom.  Claimant also admitted the CMIR form disclosing the entry of

8   more than $10,000 was not filed (¶104).  Once again, claimant admitted it was her duty and

9   responsibility to obtain the ransom and get it to the kidnapers (¶105).

10      Claimant never admitted any factual activity with the *res*, and never alleged an

11  interest, as an owner or possessor, which would entitle her to contest this forfeiture action, let

12  alone prevail on the merits.  For example, claimant denied any ownership or interest in the

13  approximately $28,000 aggregated funds to be provided as a ransom on the basis of lack of

14  specific knowledge (¶53) .  She elected to provide no allegation regarding her specific

15  knowledge of whether any portion of this sum was contributed by her.  She simply denied

16  any relationship to this first contribution to the *res* and is, therefore, never entitled to its

17  recovery.

18      Similarly, beginning  at ¶59, claimant denied all allegations regarding activities

19  alleged to have been done on March 11, 2008, including that she participated in an interview

20  with a Phoenix Police Detective.  Therefore, claimant denied she delivered a sum of currency

21  as a portion of the ransom, as alleged in the complaint (¶59); claimant alleged she was not

22  photographed and fingerprinted (¶60); claimant appears to allege it is possible for her to

23  drive from Douglas, Arizona to the Phoenix Police Department in one hour and five minutes

24  (¶63);  claimant both denied allowing another to illegally use claimant's identification and

25  denied claimant remained in the Phoenix area that night (¶64); claimant denied she delivered

26  any currency to be used as ransom for the release of Pedro (¶65).

27      At ¶157 the narrative in the complaint is related to movement of currency from

28  Phoenix to Agua Prieta.  Claimant denied the allegation without further elaboration.  The

impact is claimant denied she told the Police Officers she did not move the money to Mexico, thus admitting she did take the money to Mexico.  Further, claimant also denied she claimed she left $64,000 in Douglas, before returning to Mexico.  Claimant denied any of the funds were generated from a loan on her home (¶162).  Claimant denied providing 17 receipts which she alleged was the source of the currency which is the *res* in this action (¶164).  Finally, claimant denied she provided withdrawal slips from family and friends as proof of the legitimate source of funds to be used to pay the ransom (¶165).  In short, claimant has never alleged or admitted any involvement with the *res* in this action other than she is aware the currency was gathered together in Agua Prieta, Mexico, and was driven in three cars from Mexico to Phoenix to pay the ransom in such a manner that a CMIR form was not filed.

### B.  The Burden of Proof

With the passage of the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub. L. No. 106-185, 114 Stat. 202 (2000), Congress mandated a fundamental change in the government's initial burden of proof in civil forfeiture actions.  CAFRA applies to all forfeiture proceedings commenced on or after August 23, 2000.  Prior to CAFRA, the government had the initial burden of showing probable cause for the forfeiture.  Once the government established probable cause, the burden shifted to the claimant to prove, by a preponderance of the evidence, either that there was no probable cause or that he/she was an "innocent owner."  <u>*See United States v. All Assets of GPS Automotive Corp.*</u>, 66 F.3d 483, 487 (2d Cir. 1995);  *United States v. Daccarett*, 6 F.3d 37, 57 (2d Cir. 1993), *cert. denied*, 114 S. Ct. 1294 (1994).   Under CAFRA, however, the government has the burden of first establishing, by a preponderance of the evidence, that the defendant currency is forfeitable.  CAFRA applies to this action because it was commenced after August 23, 2000.  CAFRA does not, however, in any way limit the right of either party to seek summary judgment.  <u>See</u> House Passage of H.R. 1658, Floor Statements, 146 Cong. Rec. H2040-01, 2000 WL 368969 (Cong. Rec.), Proceedings and Debates of the 106th Congress, Second Session, Tuesday, April 11, 2000) ("The bill is not intended to limit the right of either party to bring a motion

4

1  for summary judgment after the filing of the complaint pursuant to Fed. R. Civ. P. 56(a) or

2  56(b).").  Plaintiff has established this burden upon the facts conceded in the pleadings.  In

3  addition, claimant has failed to allege any basis upon which judgment may be entered on her

4  behalf.

5

6  **C.  An Affirmative Defense Has Not Been Properly Alleged**

7      The pleading requirements for the assertion of an affirmative defense are not novel

8  and are a well cited topic of Hornbook Law.

9          Affirmative defenses are subject to the pleading requirements of FR Civ.
10     P.  Rule 8. [citing cases] Thus, in pleading an affirmative defense, the pleader
       must set forth a short and plain statement of the defense. [citing cases]
11     Assertions of legal conclusions unsupported by facts are not sufficient as
       affirmative defenses under FR Civ P.  Rule 8. [citing cases] Where an
12     affirmative defense was sufficiently raised in a trial court in a manner that did
       not result in unfair surprise or prejudice to the plaintiff, technical failure to
       comply precisely with FR Civ P, Rule 8(c) is not fatal. [citing cases]
13
14         The legal sufficiency of an affirmative defense is decided on the basis of
       the pleadings alone. [citing cases] The key to determining the sufficiency of
15     pleading an affirmative defense is whether it gives the plaintiff fair notice of
       the defense. [citing cases] ....An affirmative defense is legally insufficient if, as
16     a matter of law, it cannot succeed under any circumstance. [citing cases]

17  61A Am. Jur.  2d Pleading §366

18      As noted above, claimant has denied all association with the *res* in this action.

19  Claimant has made no factual allegation regarding how an ownership or possessory interest

20  in the *res* arose.  Although it is clear from the admissions in her Answer that funds were

21  contributed to the *res* by family, friends, and business associates, claimant has neither

22  identified those who contributed the funds nor alleged she acted as a bailee for the hidden

23  owners.   No factual or legal allegations exist in the Answer by which plaintiff is provided a

24  basis, explanation, or hint regarding the circumstances or legal theory which would support

25  the affirmative defense of "innocent owner."  Claimant merely cites the statute, 18 U.S.C. §

26  983(d)(3).

27      This statute places the burden of proving the affirmative defense upon the claimant by

28  the preponderance of the evidence.  See 18 U.S.C. 983(d)(1).  To sustain this assertion

   claimant must plead and prove the following elements:  (1) claimant (2) acquired an interest

5

1  in the *res* (3) after the conduct giving rise to the forfeiture has taken place (under this

2  analysis, the transportation of the currency into the United States from Mexico without the

3  filing of a CMIR) (4) was a bona fide purchaser for value of the *res* (5) and was reasonably

4  without cause to believe the *res* was subject to forfeiture.

5        Given the detailed factual pleadings in the complaint, the general or blanket denials

6  provided in the Answer, and the lack of any specificity in the assertion of the affirmative

7  defense, it is apparent no effort has been made to comply with the statutory requirement of

8  establishing claimant is an "innocent owner" by the preponderance of the evidence.  Rather,

9  a substantial effort has been made to avoid any specificity in the Answer to conceal and

10  avoid the disclosure of any facts or legal theory by which claimant might prevail.  This is

11  precisely the conduct criticized by Judge Trott when he described the actions of attorney

12  Richard M.  Barnett who refused to identify the source of the *res* at issue.

13        A court is not a place to play hide-and-go-seek with relevant evidence
   and information.  Lankford's information was certainly relevant, for when one

14  claims an interest in forfeitable property as a bailee, the identity of the
   purported owner, as well as sufficient information to investigate the validity of

15  the claim of an owner-bailee relationship, are needed.

16  *United States v.  Currency, U.S. $42,500.00,* 283 F.3d 977, 983, (9th Cir 2002).  *See also*

17  Concurrence by Judge Trott.

18        In a slip opinion not binding on any Arizona District Court, Judge McNamee recently

19  considered whether affirmative defenses merely listed by name provided sufficient detail and

20  notice.  None of the affirmative defenses included in the list was "innocent owner," yet his

21  review and analysis is worthy of consideration.

22        "The key to determining the sufficiency of pleading an affirmative defense is
   whether it gives plaintiff fair notice of the defense."   *Wyshak v. City Nat.*

23  *Bank,*  607 F.2d 824, 827 (9th Cir. 1979)….

24        The Court's central task in deciding this motion is thus to determine whether
   the affirmative defenses as stated provide sufficient notice of their bases.  (sic)

25  Certain matters must be pled with particularity, including lack of capacity to
   sue. Fed.R.Civ.P. 9(a).  The sufficiency of pleading other affirmative defenses

26  depends on the nature of the affirmative defense.  Merely naming the defense
   may be sufficient for some defenses, whereas others may require a brief

27  explanation of why the defense might apply.  *See, e.g. Qarbon.com Inc. v.*
   *eHelp Corp.* 315 F.Supp.2d 1046, 1050 (N.D. Cal. 2004).

28

6

1    *Torres v. Goddard,* 2007 WL 4287812 (D.Ariz Dec.  3, 2007))

2            Judge McNamee struck eight of the listed affirmative defenses because fair notice was

3    not provided.  The theme common to each stricken pleading was lack of specificity and detail

4    is fatal.  Due to the complexity of the issues alleged in the complaint, it was not appropriate

5    to merely reference a doctrine, without any legal or factual elaboration.  The impact of the

6    prohibited drafting technique was to delay the duty of the drafter of the Answer to provide

7    fair notice, thus requiring  plaintiff to speculate regarding the nature and substance of the

8    defense.  Plaintiff should not be required to speculate when fair notice is required from

9    claimant.

10            **D.  The  Innocent Owner Affirmative Defense Is Not Available**

11            The Ninth Circuit recently had the occasion to consider this same statutory affirmative

12   defense in the context of a strict liability forfeiture provision of the Lacey Act.  Similar to the

13   Bulk Cash Smuggling forfeiture provisions, the Lacey Act requires the forfeiture of the *res* if

14   it is "imported, exported, transported, sold, received, acquired, or purchased contrary to the

15   provisions of section 3372 of this title (other than section 3372(b) of this title), or any

16   regulation issued pursuant thereto…."  *United States v. 144,774 Pounds of Blue King Crab,*

17   410 F.3d 1131, 1133-34 (9th Cir. 2005).  In this case the item illegally brought into the United

18   States was 144,774 pounds of Blue King Crab rather than currency.  The issue was whether

19   the "Innocent Owner" affirmative defense was available in the context of the limitations of

20   18 U.S.C.  § 983(d)(4) which provides:

21            Notwithstanding any provision of this subsection, no person may assert an
             ownership interest under this subsection in contraband or other property that it
22           is illegal to possess.

23            The pivotal point in the analysis was whether crab which is illegally brought into the

24   United States becomes contraband within § 983(d)(4) and therefore unavailable for the

25   assertion of the "innocent owner" affirmative defense.  The Court held that once the

26   government established the illegal importation, the crab became contraband and the innocent

27   owner defense was not available.

28            We believe that the phrase "other property that it is illegal to possess" includes
             property that becomes illegal to posses because of extrinsic

7

1   circumstances…..we conclude that, if the government establishes that the crab
2   at issue here is taken, possessed, transported, or sold in violation of Russian
    law, it is "other property that it is illegal to possess."

3   *Supra.*

4        Because, under the Lacey Act, the crab was subject to forfeiture if the government

5   established it was brought illegally into the United States, once the government established

6   the crab was contraband, the affirmative defense was no longer available. Due to the

7   extrinsic circumstances no person could claim an ownership interest. The analysis is exactly

8   the same if crab is exchanged for $93,110 of U.S. currency illegally transported from Mexico

9   into Arizona without the filing of the required CMIR disclosing the transportation of the

10  currency. The statutory scheme outlined above regarding the forfeiture of currency pursuant

11  to the CMIR and Bulk Cash Smuggling is as precise as the Lacey Act provisions. The funds

12  become contraband once the government establishes the elements of forfeiture. Claimant has

13  admitted knowledge and actions inconsistent with the innocent owner provision and has

14  failed to disclose the principals for whom she acted who were, in fact, the source of the

15  funds. Upon this record, no person may claim an ownership interest in the *res* and the

16  affirmative defense of innocent owner is not available.

17       **E.  Based upon the Uncontested Facts, Plaintiff Is Entitled to Judgment**

18       The law is absolutely clear a CMIR must be filed by the person who moves currency

19  across the border or by his agent or bailee.

20  31 U.S.C. §5316(a)(2): Except as provided in subsection (c) of this section, a
    person or an agent or bailee of the person shall file a report under subsection
21  (b) of this section when the person, agent, or bailee knowingly – receives
    monetary instruments of more than $10,000 at one time transported into the
22  United States from or through a place outside the United States.

23       Congress intended that CMIR reports be filed in exactly the same factual situation as

24  addressed in these pleadings. At 31 U.S.C. § 5315(c) Congress directed the Secretary of the

25  Treasury prescribe regulations consistent with the intent of the statute to require reporting of

26  the flow of capital in international commerce. One specific regulation is directed to the

27  factual situation presented in this action. Pursuant to this regulation, claimant must file the

28  report.  31 CFR 103.23(a) provides:

8

1      Each person who physically transports, mail, or ships, or causes to be

2      physically transported, mailed or shipped, or attempts to physically transport, mail or ship, or attempts to cause to be physically transported, mailed or

3      shipped, currency or other monetary instruments in an aggregated amount exceeding $10,000 at one time from the United States to any place outside the

4      United States, or into the United States from any place outside the United States, shall make a report thereof.  A person is deemed to have caused such

5      transportation, mailing or shipping when he aids, abets, counsels, commands, procures, or requests it to be done by a financial institution or any other person.

6      Regardless of whether claimant transported the currency across the border herself or

7 obtained the assistance of co-conspirators, claimant admitted the funds were being

8 transported into the United States to pay a ransom without the requisite CMIR.  (¶¶ 93-105)

9 Even if claimant merely received the currency in the United States after she knew it was

10 transported into the United States from Mexico without a CMIR filing, 31 C.F.R. § 103.23(d)

11 requires her to file the CMIR form within 15 days.  Failure to comply also subjects the

12 currency to forfeiture.

13      Upon information and belief, claimant's knowledge the funds were proceeds of illegal

14 activity, including drug trafficking and human smuggling, provided the incentive to conceal

15 the currency as it moved across the border.  Failure to comply with the CMIR reporting

16 requirement is the basis for the forfeiture of the funds involved.  *See* 31 C.F.R. 103.27(a)(3);

17 *United States v. $170,000,* 903 F. Supp. 373 (E.D.N.Y. 1995)(property becomes forfeitable at

18 the time the owner leaves it with a common carrier and fails to file CMIR form).  Regardless

19 of the identity of the owner or bailee, lack of knowledge regarding the CMIR filing

20 requirements is not a defense to this civil forfeiture action and has not been alleged.  Based

21 upon the admissions outlined above, specifically including  paragraphs 101-105 of the

22 Answer, the currency is subject to forfeiture.

23      On the facts admitted in the pleadings and upon the law as outlined, the *res* has

24 violated the provisions of 31 U.S.C. §5316(a)(2), subjecting the currency to forfeiture

25 pursuant to 31 U.S.C. §5317 (c)(2).  In addition, because the admitted purpose was to import

26 the currency without filing the required CMIR forms and because claimant caused the money

27 to be brought into the United States from Mexico and the funds were destined to a place

28 inside of the United States, to wit: Phoenix, and because claimant received more than

9

1   $10,000 and the currency  was transported while concealed on a person or in a conveyance,

2   31 U.S.C. § 5332(a)(1) was also violated, subjecting the currency to forfeiture pursuant to 31

3   U.S.C. § 5332(c).  Based upon claimant's admission she arranged for the money to be driven

4   from Mexico in three cars because of the amount of money (¶ 103) the *res* has been involved

5   in structuring transactions to avoid the CMIR filing requirements, also subjecting the

6   currency to forfeiture. See 31 C.F.R. § 103.22; 31 U.S.C. § 5324 and *U.S. v. Morales-*

7   *Vasquez*, 919 F.2d 258 (5th Cir. 1990).

8        **F.  Claimant Cannot Prevail on the Innocent Owner Affirmative Defense**

9        While it is apparent plaintiff must speculate regarding details of claimant's theory of

10  affirmative defense, based upon the admissions and denials contained in her Answer, it is

11  also apparent she cannot prevail, even if the defense is available and is eventually properly

12  pled.  Claimant admitted the basis for forfeiture for both Bulk Cash Smuggling and for

13  offenses related to the transportation of the *res* into the United States without the filing of the

14  requisite CMIR Form.  The burden is now upon claimant to prove by the preponderance of

15  the evidence the defendant currency is not subject to forfeiture.  Because that defense cannot

16  succeed, based upon the admissions and denials in the Answer, plaintiff is entitled to

17  judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c).

18       Claimant asserted the affirmative defense of innocent owner by merely by citing the

19  statute alleged (docket #4) 18 U.S.C. § 983(d)(3)(A):

20       § 983(d)(1):  An innocent owner's interest in property shall not be forfeited
         under any civil forfeiture statute.  The claimant shall have the burden of
21       proving that the claimant is an innocent owner by a preponderance of the
         evidence.
22
         § 983(d)(3)(A): With respect to a property interest acquired after the conduct
23       giving rise to the forfeiture has taken place, the term "innocent owner" means a
         person who, at the time that person acquired the interest in the property –
24
             (i) was a bona fide purchaser or seller for value (including a
25           purchase or seller of goods or services for value); and

26           (ii) did not know and was reasonably without cause to believe
             that the property was subject to forfeiture.
27
28  This statute  requires claimant to prove she acquired her interest in the currency for

    value only after the conduct which gave rise to the forfeiture, without knowledge the

    10

currency was subject to forfeiture.  In this case, "knowledge" refers to the knowledge the funds were moved across the Mexico-United States border.  It is not relevant whether claimant had knowledge that a report must be filed when the currency was transported into the United States.

> Claimants' other argument is that scienter is an element which must be established in a civil forfeiture proceeding under § 5317, and that because Kraitamchitkul was unaware of the reporting requirement the government's motion should be denied.  This argument is both factually and legally unmeritorious.  Based on affidavits submitted by the United States, the Court is satisfied that Kraitamchitkul was conversant in English and that he stated to agents in that language that he indeed knew of the currency reporting requirement....
>
> The Court makes the further determination that scienter is *not,* as claimants contend, an essential element of a civil forfeiture proceeding.  The term "knowingly" in § 5316 refers only to the knowing transportation of currency, not to specific knowledge of the reporting requirements.  *United States v. $4,255,625.29,* 528 F.Supp. 969, 971-972 (S.D.Fla 1981); *see also One Lot Emerald Cut Stones and One Ring v. United States,* 409 U.S. 232, 234, 93 S.Ct. 489, 492, 34 L.Ed.2d 438 (1972) (forfeiture action under a similar statute, 19 U.S.C. § 1497 required no proof of knowledge of reporting requirement.  Claimants' theory must therefore by rejected.

*United States v. $831,160.45 United States Currency,* 607 F.Supp 1407, 1414 (N.D. Ca. 1985).

For civil forfeiture purposes knowledge of the reporting requirement is not necessary for forfeiture. The word, "knowingly" in 31 U.S.C. § 5316 modifies the word "transports." The person transporting the currency must merely be aware that he is transporting monetary instruments. Knowledge is only required to convict.  *United States v. $47,980 in Canadian Currency*, 804 F. 2d 1085, 1090-1091 (9th Cir. 1986), *United States v. $122,043 in U.S. Currency*, 792 F.2d 1470, 1474 (9th Cir. 1986), *United States v.  $831,160.45 in U.S. Currency*, 607 F. Supp. 1407, 1414 (N.D. Cal. 1985) aff'd 755 F.2d 317 (9th Cir. 1986), *Ratzlaf v. United States,* 510 U.S. 135, 147 n. 16, 114 S. Ct. 655, 662 n16.  Because claimant has admitted knowledge which is inconsistent with the definition of an "innocent owner," she cannot prevail and plaintiff is entitled to judgment on the pleadings.

**SUMMARY**

As the case presently stands, there is no fact nor controversy before the Court with respect to Claims 3, 4, 5, 6, and 8.  Claimant has placed nothing at issue as the result of the her Answer.  On the uncontested facts and the clearly stated law, the owner or bailee of the funds, whoever that might be, has violated  31 U.S.C. §5316(a)(2), subjecting the currency to forfeiture pursuant to 31 U.S.C. §5317 (c)(2);  31 U.S.C. § 5332(a)(1), subjecting the currency to forfeiture pursuant to 31 U.S.C. § 5332(c);  31 U.S.C. § 5324(c)(1) and 3, subjecting the currency to forfeiture pursuant to 31 U.S.C. § 5317(c)(2); and 31 U.S.C. § 5316(a)(1)(B), subjecting the currency to forfeiture pursuant to 31 U.S.C. § 5317(c). Claimant has alleged no fact or circumstance upon which claimant may prevail under these uncontested facts and the prevailing law.  Plaintiff is entitled to judgment pursuant to Fed.R.Civ.P. 12(c).

WHEREFORE, the United States of America prays judgment be entered declaring the defendant forfeited to the United States of America, pursuant to the Claims 3, 4, 5, 6, and 8; for disposition according to law; and that the United States of American be granted such other relief as this Court may deem just and proper, together with the cost and disbursement of this action.

Respectfully submitted this 19th day of September, 2008.

DIANE J. HUMETEWA
United States Attorney
District of Arizona


*S/Reid C. Pixler*

REID C. PIXLER
Assistant U.S. Attorney

12

1

CERTIFICATE OF SERVICE

2    I hereby certify that on September 19, 2008, I electronically transmitted the attached document to the Clerk's
3    Office using the CM/ECF System for filing and transmittal of Notice of Electronic filing to the following
     CM/ECF registrant:

4    Elsa Bernal
     c/o Richard B. Jones
5    273 South Scott Avenue
     Tucson, Arizona 85701
6    richard.b.jones@azbar.org

7

8    By: s/Regina Spurlock

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13